IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: GRETTER AUTOLAND, INC., <br><br> Debtor. | Case No. 14-02831als[1] <br><br> Chapter 11 |

**MOTION FOR ORDERS:**

**(I) APPROVING ON AN EXPEDITED BASIS ON OR BEFORE JANUARY 15, 2015 (A) BREAK-UP FEE AND (B) BID PROCEDURES FOR THE CONDUCT OF AN AUCTION; (C) FIXING THE DATE AND TIME OF THE SALE HEARING; (D) FIXING MANNER AND NOTICE OF SALE HEARING; AND (E) FIXING A CURE CLAIMS BAR DATE AND ESTABLISHING PROCEDURES FOR DETERMINING CURE CLAIMS WITH RESPECT TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND**

**(II) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS; AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

COMES NOW the Debtor, Gretter Autoland, Inc. (the "Debtor"), by its attorneys, Bradley R. Kruse and the law firm of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., and makes this motion (the "Motion") for entry of orders granting the following forms for relief:

**Request for Relief No. I:**

**Approval of Proposed Bid Procedures and Related Relief.**

The Debtor requests that the Court enter an order on an expedited basis on or before January 15, 2015: (a) approving a breakup fee (the "Break-Up Fee,"); (b) approving bid

---

[1] Jointly Administered with: *In re Gretter Ford Mecury, Inc*., Case No. 14-02832-als; and *In re Gretter Chevrolet*, Case No. 14-02833-als.

1

procedures (the "Bid Procedures") to be utilized in connection with the Auction of the Assets to be held prior to the Sale Hearing (as defined herein) (the "Auction"); (c) fixing the date and time of a hearing (the "Sale Hearing"); (d) approving the form, manner, and form of notice of the Sale Hearing; and (e) fixing the last date by which the non-Debtor parties to executory contracts and unexpired leases must file Cure Claims (as defined herein), and establishing procedures for determining Cure Claims with respect to the Debtor's assumption and assignment of Executory Contracts to Purchaser.

**Request for Relief No. II**

**Approval of Sale of Substantially All of the Estate's Assets, Free and Clear of All Claims, Liens and Encumbrances, Subject to Higher and Better Offers.**

The Debtor requests that the Court enter an order approving an asset purchase agreement and authorizing the sale of substantially all of the Estate's assets and such other non-debtor assets as the Debtor may be authorized to convey (the "Assets") pursuant to § 363(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), free and clear of claims, liens and other encumbrances and, in connection therewith, approving the assumption and assignment of the Executory Contracts pursuant to § 365 of the Bankruptcy Code and Bankruptcy Rule 6006. As discussed herein, the Debtor has executed the attached Asset Purchase Agreement (the "APA")[2] with Performance Automotive of Iowa, L.C. and Capper Auto Center, Inc. (collectively the "Purchaser"), dated as of December 30, 2014, pursuant to which the Debtor proposes to sell substantially all of its assets

---

[2] In the event a definitive APA cannot be reached with the proposed Purchaser, the Debtor reserves the right to file an APA with an alternative purchaser or a form of APA for use by interested bidders consistent with the terms of the proposed Bid Procedures.

as defined in the APA (the "Assets") free and clear of all liens, claims and encumbrances, subject to higher or better offers. A true and accurate copy of the APA is attached hereto as Exhibit A.

## INTRODUCTION

The Debtor has entered into the APA with Purchaser (subject to this Court's approval) to purchase substantially all of the Assets. The Debtor's consummation of the proposed sale with the Purchaser, pursuant to the terms of the APA, shall be subject to higher and better offers, if any, received at or before the Auction which shall occur prior to the Sale Hearing, provided that Qualified Bids (as defined herein) are received pursuant to the Bid Procedures (as described herein). For the reasons set forth herein, the Debtor requests that the Court approve a Break-Up Fee in the amount of 3% of the purchase price set forth in the APA, and establish Bid Procedures to govern the conduct of the Auction. The proposed sale is the result of substantial good faith, arms' length negotiations and provides a vehicle for the Debtor to maximize asset values through an auction sale process.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (m), (n), and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## BACKGROUND

2.      The Debtor is an automobile dealership located in Washington, Iowa, and is engaged in the sale and leasing of new and used vehicles to retail customers, as well as in the

servicing vehicles. The Debtor holds two manufacturer franchises, one from General Motors and one from Ford.

3. The Debtor's financial difficulties leading up to its filing of this bankruptcy case stem from a variety of factors, including extensive losses on the sale of used cars, significant costs incurred in making manufacturer required updates to its business premises, high advertising costs, and high debt service costs.

## THE CHAPTER 11 CASE

4. A Voluntary Petition under Chapter 11 of the Bankruptcy Code [Docket No. 1] was filed by the Debtor on December 1, 2014 ("Petition Date"). The Debtor has since been operating its business and managing its assets as a Debtor-in-Possession pursuant to Bankruptcy Code Sections 1107 and 1108.

5. At the start of the Debtor's bankruptcy, it did not have sufficient unencumbered funds to perform its business operations. The Debtor is currently seeking authority from the Court to use the cash collateral of various secured creditors, as without the use of the cash collateral of the secured creditors, the Debtor would be unable to fund critical operating functions. Specifically, the Debtor has entered into a stipulation for the use of cash collateral with Washington State Bank and Ally Financial, Inc. (the "Stipulation"), for which the Debtor is currently seeking Court approval.

6. On December 12, 2014, the United States Trustee filed a motion to dismiss the Debtor's case, which motion is currently pending before the Court. The Debtor believes that most, if not all, of the issues raised in the U.S. Trustee's motion have been resolved or can be resolved such that dismissal is not warranted.

7.      The Debtor believes that the cash collateral authority and the budget provided in the Stipulation are sufficient to provide the Debtor with requisite operating funds to enable the Debtor to continue operating its business pending the sale process as outlined herein.

8.      The Debtor is informed and believes that the Purchaser's interest in purchasing the Debtor's car dealership business is conditioned on the dealership remaining open as a going concern, as well as on the dealership having sufficient cash collateral authority to engage in full sales operations of new and used cars. The Debtor also believes that these factors would be important to any other potential purchaser of the Debtor's Assets. Therefore, in order to maintain the value of the Debtor's Assets, it is crucial that the Debtor's business remain operating and able to fully engage in the sales of new and used cars.

## THE PROPOSED SALE

9.      Prior to the Petition Date, the Debtor had actively been marketing its car dealership business through a professional broker since May 15, 2014.

10.      On December 30, 2014, the Debtor entered into the APA with Purchaser for the sale of substantially all of the Debtor's car dealership assets, plus the dealership real estate leased by the Debtor (subject to the Court approval of same through an open bidding process).

11.      Although the Debtor received interest from other potential purchasers of its car dealership business, the APA represents the only offer received from any potential purchaser.[3] The Debtor believes that the terms reflected in the APA represent the highest and best terms of sale that the Debtor can expect to receive for its car dealership business at this time.

---

[3] The APA stems from and is substantially similar to an earlier Letter of Intent the Debtor executed with Iowa Automotive Holdings, L.C., through its Managing Member, Jon Monte Bell, who is also the Managing Member of purchaser, Performance Automotive of Iowa, L.C.

5

12. The APA provides a vehicle for the disposition of substantially all of the Estate's operating assets and, at the same time, establishes a benchmark by which the Debtor may appraise any alternative offers arising from the marketplace.

13. The Debtor believes that the APA is fair and reasonable. The APA enables the Debtor to proceed with an auction sale process which provides the Estate and its creditors with the best means to maximize the value of the Assets. The Debtor seeks approval of the proposed sale subject to the submission of higher and better offers.

14. The following is a general explanation of the salient terms of the APA. Capitalized terms not defined herein shall have the meanings ascribed to them in the APA:[4]

> Purchased Assets: The APA contemplates that the Debtor, on behalf of the Estate, will sell, convey, assign and transfer to Purchaser substantially all of the Assets (other than the Excluded Assets) used in connection with or related to the Business on the terms and subject to the conditions set forth in the APA, including, but not limited to all New Vehicles, Used Vehicles, New and Used Parts (subject to some limitations), Tools and Equipment, dealership franchise rights, and goodwill of the business.
>
> Excluded Assets: The Assets shall not include cash, cash equivalents, pre-paid deposits and/or avoidance actions of the Debtor's Estate existing on the Closing Date (as defined in the APA). It also excludes certain New and other parts for Ford vehicles and used equipment and tools for which a mutually agreed value cannot be reached.
>
> Sale on "as is, where is" basis: The sale of the Assets shall be on an "as is" basis, subject only to warranties regarding their suitable use as presently used by Sellers.
>
> Purchase Price: The purchase price for the Assets is to be paid in cash, calculated in the manner set forth in the APA (the "Purchase Price"), which includes: (i) payment for New Vehicles at net cost from the manufacturer less certain deductions for mileage, (ii) payment for Used Vehicles at a mutually agreed price (or excluded from sale), (iii) payment for New Parts for dealer cost, (iv) payment

---

[4] The following is merely a summary of the APA and is qualified in its entirety by the actual, express terms of the APA and the definitive APA to be filed. To the extent there is any discrepancy between this summary and the terms of the APA, the terms of the APA shall control.

for other parts at a mutually agreed price (or excluded from sale), (v) payment for the dealership franchises of $350,000.00, and (vi) payment for tools and equipment at a mutually agreed price within ten (10) days of execution of the APA (or excluded from sale).

Due Diligence Requirement: The Purchaser's consummation of the transaction contemplated under the APA is conditioned upon satisfactory completion of business, financial, legal, asset ownership and accounting due diligence, all of which must be acceptable to the Purchaser in its sole and absolute discretion. Due diligence shall be completed prior to any auction pursuant to a bidding process and/or the final Court hearing involving the entry of the transaction approval order.

Conditions: The conditions to closing include, among other things, entry of an order by the Bankruptcy Court authorizing the sale of the Assets to Purchaser, in accordance with the terms of the APA.

No Assumed Liabilities: Except as provided in the APA (with respect to liabilities from and after closing arising under the Executory Contracts), the Purchaser is not acquiring any debts or obligations of the Debtor.

Executory Contracts. The APA contemplates the assumption and assignment of the Executory Contracts. Cure Costs, if any, are to be paid by the Purchaser. As discussed herein, the Debtor requests that the Court fix a bar date for the assertion of any Cure Costs by the non-debtor parties to the Executory Contracts to be assumed and assigned to the Purchaser under the APA.

## ADDITIONAL DISCLOSURES

15. Prior to the Sale Hearing, the Purchaser shall complete a disclosure statement, sworn to under the penalty of perjury, setting forth, among other things: (a) any and all connections or affiliations of the Purchaser with any creditors or parties in interest in the case, including, without limitation, connections or affiliations with the Debtor's principals or members of the Debtor's management; and (b) the fact that the Purchaser has not engaged in any improper conduct with actual or potential bidders for the Assets.

## BID PROCEDURES

16. The Debtor and the Purchaser recognize that the sale of the Assets is subject to

7

higher and better offers pursuant to applicable bankruptcy law. The Purchaser is prepared to consent to subject its offer to higher and better bids provided it receives overbid protection, the Court approves the Break-Up Fee, and appropriate bid procedures are put in place. Set forth below are the proposed Bid Procedures to be employed with respect to the Auction (if any)[5]:

    a.    <u>Bid Deadline.</u> All alternative bids must be submitted to the Debtor at the offices of its attorneys, Bradley R. Kruse and Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., 666 Grand Avenue, Suite 2000, Des Moines, Iowa 50309-2501 and by email at kruse@brownwinick.com by no later than _____ at 3:00 p.m. Central Time (the "Alternative Bid Deadline").

    b.    To the extent any proposed bidder wishes to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance acceptable to the Debtor. All due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

    c.    <u>Qualified Bid.</u> Only alternative bids that satisfy the following qualifications will be considered a "Qualified Bid" by the Debtor:

        i.    The bid must be <u>received</u> by the Debtor's attorneys, Bradley R. Kruse and Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., 666 Grand Avenue, Suite 2000, Des Moines, Iowa 50309-2501 and by email at kruse@brownwinick.com on or before the Alternative Bid Deadline.

        ii.    The bid must be accompanied by a down payment deposit in immediately available funds of no less than ten (10%) percent of the proposed purchase price and by a duly executed sale agreement, substantially similar to the APA and marked to reflect variations thereto, but in no event shall such sale agreement be less favorable to the estate that than the terms of the APA. The deposit will be non-refundable if the bidder is selected as Successful Bidder (as defined below) and fails to consummate the purchase (other than as a result of a breach by the Debtor or the failure of the Bankruptcy Court to approve the sale through no fault of the Successful Bidder). The deposit will be refundable if the bidder is not selected as the Successful Bidder.

---

[5] The Debtor reserves the right to propose amended and/or alternate bid procedures in the event the current Bid Procedures are not approved by the Bankruptcy Court.

    iii.    An alternative bidder must also identify which contracts and/or leases it seeks to have the Debtor assume and assign to such bidder.

    iv.    The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of (A) the Purchase Price as defined in the APA (the "Stalking Horse Bid"), plus (B) the amount of the Break-Up Fee, <u>plus</u> (C) $20,000 ((A), (B) and (C), collectively, the "Initial Overbid"). The deposit will be non-refundable if the bidder is selected as the highest and best bidder (the "Successful Bidder") and fails to consummate the purchase (other than as a result of a breach by the Debtor) and refundable if it is not selected as the Successful Bidder. In the event a bidder (including Purchaser) is the second best bidder, its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the successful bidder.

    v.    Without limiting the generality of the foregoing, such bid shall be for the Assets and any liabilities to be assumed under the APA on an as-is, where-is basis and shall not include any due diligence, financing or other contingency. Further, the Debtor shall not make any representations or warranties above, beyond or in addition to those made in the APA.

    vi.    The bid must be expressly made subject to the Debtor's obligations to pay the Break-Up Fee pursuant to the terms of the APA.

    vii.    Simultaneously with the delivery of the down payment deposit and the executed APA, an entity submitting an alternative bid shall deliver financial information to Debtor's counsel evidencing that such party has the financial wherewithal to consummate the proposed transaction on the terms proposed and to demonstrate to the counterparties under the contracts and/or leases to be assumed that the bidder can provide adequate assurance of the bidder's ability to perform in the future under such contracts and/or leases. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction. In the event the financial information pertains to the parent corporation of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent.

    viii.    The entity submitting an alternative bid shall also provide evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity.

    ix.    An entity submitting an alternative bid shall complete a disclosure statement, which shall be sworn to under the penalty of perjury under pursuant to 28 U.S.C. § 1746 setting forth any and all connections or affiliations of the proposed bidder, whether direct or indirect, express, implied, contingent or

        unmatured, with any creditors or other parties-in-interest in the case, including, without limitation, connections or affiliations with the Related Parties, including intention to employ or enter into consulting agreements with such parties post sale. The disclosure statement shall also (a) indicate whether and to what extent any Related Party will have an interest, directly or indirectly, in the Assets and/or the acquiror of the Assets following the consummation of any proposed sale transaction with the Debtor; (b) the bidder's post-sale intention with respect to operation of the Dealership, and the continuation of the Debtor's intellectual property, including, but not limited to trade name and all trademarks; and (c) a statement affirming that the bidder has not engaged in any improper conduct with actual or potential bidders for the Debtor's Assets.

    x.    Only those bids bidders having submitted Qualified Bids ("Qualified Bidders") will be permitted to participate in the Auction. The Debtor, after consultation with Washington State Bank, Ally Financial Inc. and the Official Committee of Unsecured Creditors (the "Committee"), if any, will promptly notify each alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder.

d.    <u>Auction Procedures and Bidding Increments.</u>

    i.    At the Auction (A) all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction must exceed the prior offer by not less than $20,000; (D) with respect to any such further overbid submitted by the Purchaser, the consideration offered by the Purchaser shall be deemed to include the full amount of the Break-Up Fee potentially payable to the Purchaser; and (E) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the Debtor;

    ii.    The Auction will be conducted openly and each Qualified Bidder will be informed of the terms of the previous bid;

    iii.    Upon conclusion of the Auction, the Debtor, upon consultation with Washington State Bank, Ally Financial, Inc., and the Committee, if any, shall determine the highest or otherwise best bid (the "Successful Bidder"), and such shall be submitted for approval by the Bankruptcy Court. Bids made after the Auction has closed will not be considered;

    iv.    The successful bidder shall have the burden of establishing by competent

    evidence (a) that it qualifies for section 363(m) protections and (b) adequate assurance of future performance of assigned contracts and/or leases;

  v. If the Debtor does not receive any Qualified Bids, the Debtor will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

  vi. The Debtor reserves the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction.

 e. <u>Break-up Fee.</u> The Purchaser shall receive the Break-Up Fee, in the amount of 3% of the Purchase Price set forth in the APA, excluding the portion of the Purchase Price for new vehicles, if a person other than the Purchaser is determined to be the Successful Bidder, which Break-Up Fee shall vest upon the expiration or waiver by the Purchaser of any due diligence contingency contained in the APA. The Break-Up Fee shall constitute an administrative expense of the Debtor pursuant to §503(b) of the Bankruptcy Code and the Break-Up Fee will be paid solely with respect to the cash proceeds from a sale transaction with a Successful Bidder (other than Purchaser). The Break-Up Fee shall be paid within 10 days of any closing in connection with an alternative sale of the Assets and without further order or application to the Bankruptcy Court.

## THE BID PROCEDURES ARE REASONABLE AND SHOULD BE APPROVED

17. Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. The Debtor believes that subjecting the Purchaser's offer to higher or better bids will ensure the maximization of the value of the Assets. The Debtor submits that the Bid Procedures are fair and reasonable and should be approved. They afford the Debtor the opportunity to subject the Assets to competitive bidding while preserving the Purchaser as a stalking horse bidder and thereby providing a floor price for the Assets.

18. The Bid Procedures will also ensure that the Sale Hearing is conducted in a fair and orderly manner, and that participants are *bona fide* bidders with ability and desire to consummate any proposed transaction. The Initial Overbid will foster a competitive bidding

11

process that will compensate the estate for the cost of the Break-Up Fee and permits the estate to derive an added economic benefit from any such bids. The subsequent, minimum incremental bid requirement reflects a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the estate and its estate for each successive bid.

19. In addition, in the event the Court approves the proposed Bid Procedures, the Debtor will, within five (5) days of entry of the order approving the Bid Procedures, issue a press release with respect to the same.

20. The Break-Up Fee is intended to compensate the Purchaser for its out of pocket expenses, the time expended by its staff in connection with the pursuit of this transaction, and as an incentive for the Purchaser to serve as the stalking horse bidder and subject the Assets to competitive bidding.

21. The Break-Up Fee is the result of good faith, arm's length negotiation among the parties. *See In re: Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2nd Cir. 1993); *In re: 995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (Break-up fee which is the result of good faith, arm's length agreement and not tainted by self-dealing should be upheld).

22. In the instant case, the proposed Break-Up Fee is a fair and reasonable percentage in relation to the proposed Purchase Price in light of the funds and efforts expended by the Purchaser to consummate this transaction. The Debtor submits that such a reimbursement, which is subject to reasonableness and the Court's approval, is a proper protection for the Purchaser as it works to move this process forward.

23. Accordingly, the Debtor respectfully requests that this Court enter an order approving the Break-Up Fee and Bid Procedures in the form annexed as Exhibit B hereto, and that the court conduct a hearing and enter such order on an expedited basis on or before January 15, 2015.

### THE SALE IS SUPPORTED BY SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED

24. The Debtor submits that the terms of the APA are fair and reasonable, and that ample authority exists for the approval of the sale of the Assets to the Purchaser. Section 363(b) of the Bankruptcy Code provides that a Debtor, after notice and a hearing, may use, sell, or lease property of the estate other than in the ordinary course of business. In pertinent part, the section provides:

> (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

*See* 11 U.S.C. § 363(b)(1).

25. In order for a court to approve a request for the use of property of the estate outside the ordinary course of business, the court must find that the proposed course of action is supported by sound business reasons. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2nd Cir. 1983); *see also In re Chateaugay Corp.,* 973 F.2d 141 (2nd Cir. 1993); *Bartel v. Bar Harbor Airways, Inc.,* 196 B.R. 268, 273 (S.D.N.Y. 1996); *In re Caldor, Inc.-* NY, 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996); *In re Thomas McKinnon Securities, Inc.,* 120 B.R. 301 (Bankr. S.D.N.Y. 1990). In reviewing such proposed transactions, courts should give substantial deference to the business judgment of the Debtor or debtor-in-possession. *See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R.

616, 621 n.2 (Bankr. E.D. Pa. 1987).

26. The Debtor submits that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. The Debtor is concerned that unless it is permitted to undertake an asset sale at this time, the value of the Estate's Assets will suffer, in particular, the name recognition and good will in the industry. Accordingly, the Debtor believes that conducting an auction sale will maximize the prospect of a sale of the Assets as a going concern. Thus, approval of the APA provides the Debtor the ability to maximize the value of the estate assets through a fair, open and transparent auction sale process.

27. Based upon the foregoing, the Debtor submits that the APA and the proposed sale of the Assets is in the best interests of the estate and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval. *See In re Lionel Corp.,* 722 F.2d at 1071; *Bar Harbor Airways, Inc.,* 196 B.R. at 273; *In re Caldor, Inc. -* NY, 193 B.R. at 187.

28. The Debtor and the Purchaser seek findings that the transactions contemplated by the APA are (a) subject to the protections afforded to "good faith" purchasers under § 363(m) of the Bankruptcy Code and (b) not subject to avoidance under § 363(n) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m). In addition, section 363(n) of the Bankruptcy Code provides, in

pertinent part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount . . . [including] punitive damages . . . .

11 U.S.C. § 363(n).

29. The negotiations and the resulting transaction contemplated by the APA are the result of good faith and arm's length negotiations between the Debtor and the Purchaser and resulted in a Purchase Price that is both fair and reasonable in light of the circumstances. At the Sale Hearing, the parties will adduce evidence in support of the foregoing and will request that the Court incorporate findings on these matters as part of the Order approving the sale.

### THE SALE SHOULD BE APPROVED FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES

30. Pursuant to § 363(f) of the Bankruptcy Code, after notice and a hearing, a Debtor may sell property of the estate free and clear of all liens and encumbrances. In pertinent part, the section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or

15

>  (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the requirements of § 363(f) are satisfied inasmuch as the lien creditors either do not object to the sale of the Assets or, to the extent of any competing title claims, such claims are in *bona fide* dispute.

## ASSUMPTION AND ASSIGNMENT
## OF EXECUTORY CONTRACTS

31. Section 365 of the Bankruptcy Code authorizes a Debtor to assume and assign executory contracts or unexpired leases subject to court approval. The APA provides for the assumption and assignment of various executory contracts and unexpired leases, as designed in the APA (the "Executory Contracts").

32. The decision to assume and assign an executory contract or unexpired lease is based upon the exercise of the debtor's "business judgment." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984); *In re III Enterprises Inc. V.,* 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A Debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment - - a standard which we have concluded many times is not difficult to meet"). Section 365(b) of the Bankruptcy Code requires that a Debtor or debtor-in-possession satisfy certain requirements at the time of assumption if a default exists under the contract or lease to be assumed.

33. Here, the Debtor has made the business decision to sell the Assets to Purchaser pursuant to the APA, subject to higher and better offers. As the estate holds property and equipment necessary to the conduct of the business pursuant to dealer franchises and various

16

lease agreements, a meaningful element of the value of the business to be sold stems from the Executory Contracts. As such, the assumption and assignment of the Executory Contracts is an integral component of the APA. If the Debtor is not able to assume and assign the Executory Contracts, the sale of the Assets would be substantially impaired — resulting in reduced proceeds for the benefit of the estate.

34. To effectuate the assumption/assignment process, the Debtor proposes to serve the non-debtor parties to the Executory Contacts, advising each of them of the proposed assumption and assignment of such Executory Contract (the "Notice Of Assumption/Assignment of Executory Contracts"). The Notice Of Assumption/Assignment of Executory Contracts will set forth (a) the name and address of the non-debtor parties to the Executory Contracts proposed to be assumed and assigned to the Purchaser; (b) the nature of the Executory Contract; and (c) the amounts of any cure costs that the Debtor believes to be due and owing as reflected on the books and records of the Debtor. The Purchaser is responsible for paying cure costs, if any, under any Executory Contracts that are ultimately assumed and assigned to Purchaser. Purchaser will have the right to withdraw its request as to any contract or lease as to which Purchaser is unsatisfied as to the cure amount or other requirements of assumption or assignment.

35. In order to facilitate the sale process, the Debtor requests that non-Debtor parties to Executory Contracts must be required to file a claim setting forth all claims and arrearages against the estate under such Executory Contracts (the "Cure Claims") on or before fifteen (15) days following the date of service of Notice Of Assumption/Assignment of Executory Contracts. The Debtor further requests that the Court hear any disputed Cure Claims at the Sale Hearing or a later date to be determined by the Court. The Debtor further requests that the Court provide

17

that any party that is required to file a Cure Claim, but fails to do so, shall be bound by the cure amount corresponding to its contract as set forth in the Debtor's notice of intent to assume and assign and shall be forever barred from asserting any other claim(s) against the Debtor, its estate and/or any successful purchaser of the Assets arising prior to closing under such Executory Contract.

36.   In an effort to provide the most up-to-date information to non-debtor parties to the Executory Contracts, in the event the Purchaser is not the Successful Bidder at the Auction, the Debtor will use his reasonable best efforts to provide non-debtor parties to the Executory Contracts with the identity of the Successful Bidder prior to the Sale Hearing.  Otherwise, the non-debtor parties to the Executory Contracts may want to plan to attend the Sale Hearing.

## **NOTICE**

37.   The Debtor proposes that a true and complete copy of the Motion together with its exhibits be served upon: (a) counsel to the Purchaser, (b) counsel for Washington State Bank, Ally Financial, Inc., Hills Bank & Trust Company, and Two Rivers Bank & Trust, (c) counsel to the Committee, if any, (d) all non-debtor parties to the Executory Contracts, (e) all known creditors who have or assert a lien against the Debtor's Estate's Assets; (f) the United States Attorney's Office for the District of Iowa; and (g) the Office of the United States Trustee.

38.   The Debtor further requests that the Court approve the form of notice of the Sale Hearing annexed as Exhibit C hereto (the "Notice"). The Debtor proposes to serve a copy of the Notice upon (a) all known creditors of the Debtor; (b) all federal, state and local taxing authorities in jurisdictions in which the Debtor operated; and (c) all parties that have filed a notice of appearance in this case.

## NO PREVIOUS REQUEST

39. No previous application for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court (I) enter an order on an expedited basis on or before January 15, 2015, in the form annexed as Exhibit B: (a) approving the Break-Up Fee; (b) approving the Bid Procedures to be utilized in connection with the Auction; (c) fixing the date and time of the Sale Hearing; (d) approving the form manner and form of notice of the Sale Hearing; and (e) fixing the last date by which the non-Debtor parties to the Executory Contracts must file Cure Claims; and (II) enter an order, in the form annexed as Exhibit D, approving the APA and authorizing the sale of the Assets pursuant to § 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules, free and clear of claims, liens and other encumbrances and, in connection therewith, approving the assumption and assignment of the Executory Contracts pursuant to § 365 of the Bankruptcy Code and Bankruptcy Rule 6006; and (III) grant the Debtor such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Attorneys for the Debtor | */s/ Bradley R. Kruse* |
| | Bradley R. Kruse |
| | James L. Pray |
| | Drew Larson |
| | BROWN, WINICK, GRAVES, GROSS, |
| | BASKERVILLE AND SCHOENEBAUM, P.L.C. |
| | 666 Grand Avenue, Suite 2000 |
| | Des Moines, IA 50309-2510 |
| | Telephone: 515-242-2460 |
| | Facsimile: 515-323-8560 |
| | E-mail: kruse@brownwinick.com |
| | ATTORNEYS FOR THE DEBTOR |

CERTIFICATE OF SERVICE

On December 31, 2014, this document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/ Bradley R. Kruse